For plaintiff: E. Raymond Walsh.

For defendant: Messrs. Henshaw, Lindemuth & Baker.

Catherine F. Sutcliffe, et al.  
vs.  } Eq. No. 10242.  
Pawtucket Amusement Company

August 1, 1933.

BAKER, P. J. Heard on bill, answer, replication and proof.

This is a proceeding to fix rent, brought by the lessors against the lessee, of certain property known as the Strand Theatre and located on the westerly side of East Avenue about 150 feet south from Main Street in the City of Pawtucket.

The Court has taken a view of the property involved and also of other theatre properties in said city. The premises in question consist of two buildings. The first is probably at least fifty years old and is about three and one-half stories high. It has a frontage of 40 feet on East Avenue and extends back about 100 feet. Here the lot widens out and extends back another 100 feet. The lot is somewhat irregular in shape and has a gang-way on the northerly side and on most of the southerly side. On the rear portion of the lot is a large building about four stories in height, built in 1907, which comprises the theatre proper. The other building contains an entrance and lobby to the theatre, a small store on East Avenue which is rented for $2.500 a year by the theatre company, and the second and third floors of said older building are used as a rooming house for which the theatre company receives a rent of $1,200 a year.

The respondent corporation was organized November 15, 1919, and later on changed its name. The rear portion of the property involved herein formerly belonged to a Mr. Adam Sutcliffe. The large building thereon was used partly as a garage, partly for mill purposes, and it also contained a hall in which games and entertain-

ments were held. Later on the whole building was used for warehouse purposes. Mr. Sutcliffe held an option to purchase the front portion on East Avenue, which is now part of the theatre property and contains the entrance. This option was to expire in December, 1919. Mr. Sutcliffe entered into an arrangement to lease to the respondent both the front and the rear property for theatre purposes. He died, however, in November, 1919, but the trustees named in his will exercised the option to purchase the other property and thereafter, under date of December 31, 1919, exercised with the respondent the lease which is in dispute herein.

This lease is to continue for 30 years from January 1, 1920. This time is divided into three ten-year periods. The annual rent for the first ten-year period is fixed at $9,000 per year. Provision is made in the lease for fixing, by arbitration in case the parties cannot agree, the annual rent for the other two ten-year periods, at an amount to be in no event less than $9,000 per year. The lease contains the usual covenants in connection with paying the rent, surrendering possession, agreeing not to commit or permit waste, and the like. It also contains the further terms, which are of importance, namely, that the lessee agrees to make both exterior and interior repairs, to furnish and equip the building with fire escapes and all sanitary and health equipment, to pay all taxes and assessments of every kind against the property, and to maintain fire insurance and to carry liability insurance for the benefit of both parties to the lease.

The lessee further undertook to remodel the buildings on the premises in accordance with certain plans and specifications already prepared and to expend therefor not less than $88,459. As a matter of fact, it appears in evidence that it actually spent in the neighborhood of $160,000. Finally, the lease contained the option agreement that the lessee might purchase the premises for various sums between certain fixed dates, the final understanding being that it might buy the property between January 1, 1925, and January 1, 1930, for the sum of $150,-000. This option was never exercised by the lessee.

At the end of the first ten-year period of the lease, the parties were unable to agree as to what the rental for the ten years from January 1, 1930, to December 31, 1939, should be, and three arbitrators were appointed to fix the rent. Two of them agreed that the figure of $10,500 would be the proper rent for the second ten-year period. A question had also arisen as to the consideration to be given the buildings as improved. These issues were presented to the Supreme Court. (See *Sutcliffe* vs. *Pawtucket Amusement Company*, 51 R. I. 493.) In this opinion it was determined that the award, not being unanimous, was void and that the arbitrators must consider the value of the improvements as affecting the value of the property under the lease. Following this decision the present proceeding was brought.

The first question which has presented itself relates to the proper construction to be applied to the lease now before the Court. The complainants urge very strenuously that by the lease the respondent is required to pay the full annual market value for the right to use and occupy the property and, in addition thereto, carry the other burdens which are placed upon it by the other covenants of the lease.

The complainants contend that the lease naturally falls into two parts and that there are two groupings of the burdens involved. They argue that all through the lease the rent, which is the money payment to them, is clearly and distinctly separated from all the other covenants. They refer to the language of the habendum clause in this connection.

The respondent, on the other hand, contends that the complainants herein under the provisions of this lease are entitled only to what might be termed net rent as contrasted with a gross rent. It claims that all the provisions of the lease must be taken into consideration and that the covenants do not fall into two groupings. It calls to the Court's attention the fact that the term "rents" is used in the lease and argues that this language is broad enough to cover all the money payments, such as the taxes, insurance, and repairs, which under the lease the respondent is compelled to make.

In passing upon this question undoubtedly it is of primary importance, if possible, to ascertain the intention of the parties who entered into the lease. Fundamentally this would appear to be a ground lease. It seems to the Court that the rental fixed for the first ten years cannot be considered as merely more or less nominal. It may be noted that this rent yields six per cent on the value of $150,000 as fixed in the option of purchase agreement in the lease. The language of the lease in relation to the duties of the arbitrators and in relation to the basic question now before the Court is that it is now attempting to fix "a fair and just sum for the annual rental of said demised land and the buildings thereon". In this connection it should be noted that the lease does not call upon the Court in so many words to fix the annual market value of the property or the total annual market value for use and occupation of the premises, but does call for the fixing of a fair and just sum for the annual rental. In order to arrive at this fair and just sum, the Court is of the opinion that all of the provisions of the lease in question must be taken into consideration. The provisions of the lease may naturally fall into certain divisions or groupings but it would seem that it should be considered as a whole and not in sections. The Court must

bear in mind the burdens and the benefits to both parties arising from all the covenants of the lease. After giving the matter careful consideration, the Court has come to the conclusion that this is the construction which should be given the lease. It would not seem that a fair and just sum for the annual rental could be arrived at without considering the remaining burdens and obligations which the respondent is called upon to assume.

In this connection it may be well to refer to the matter of the cost of the improvements made by the respondent. The complainants contend that as the lease called for the expenditure of nearly $90,000 and that, as a matter of fact, about $160,000 was spent in improving the property, these amounts should be apportioned over the first ten years of the lease and properly be considered as part of the rent for that period. The Court finds itself unable to agree with the complainants on this point. When the property was rented, it was entirely unsuited for theatre purposes and had to be improved. It is very probable that the lessee was willing to expend this money in return for the long lease and the opportunity to recover it over the period of years. It was held, of course, that in fixing the fair and just sum for the annual rental for the second ten-year period the value of the property as improved should be taken into consideration. In the opinion of the Court, however, this does not bring the matter down to a mere mathematical computation by spreading the expenditures over the first ten-year period. The amount of money to be expended in improvements was almost entirely within the discretion of the lessee, provided the sum of $88,459 was spent. In order to place the property in the condition in which it desired it, the respondent spent much more than this. The money paid may have added to the fair market value of the property as a whole or it may not have. Money

may have been spent to satisfy the lessee's own desire without adding anything to the value of the property. In any event, under the lease the respondent had a right to rely on the provision that a fair and just sum for the annual rental would be fixed, taking into consideration, of course, the then value of the land and buildings as improved.

In order to assist the Court in making its finding, a great mass of evidence relating to the geographical location of the theatre in Pawtucket, rentals and sales of property in the vicinity of East Avenue, rentals of other theatres in Pawtucket and Providence, and general economic trends, was introduced. It is impossible, and probably not necessary, for the Court to refer in detail to this testimony but some reference thereto is advisable.

It appears that the theatre is located on the west side of East Avenue, a short distance from Main Street. It is not greatly disputed that from a business point of view the west side of East Avenue is less desirable than the east side. The testimony further discloses that the chief business district of Pawtucket is Main Street between Main Street Square and Trinity Square. The theatre involved herein is just outside of this district but very close to it. A witness for the complainants who has had considerable theatre experience testified that the majority of theatre goers in the daytime were people shopping. Unquestionably, this theatre can easily be reached from the shopping district. The evidence also reveals that Pawtucket is the business center for most of the Blackstone Valley and possibly part of Attleboro. It caters to a population in the neighborhood of perhaps 125,000. It cannot be disputed that the recent growth of the city has been toward the west and northwest from Main Street, namely, toward what is known as Times Square and Broad Street. The doing away with the grade

crossing and the old rialroad station, the widening of streets, the building of the new Exchange Street bridge, have been indications of this general trend. There has also been a re-routing of street car and automobile traffic in the city in recent years. The testimony is perhaps not entirely clear as to how this affects the district in the neighborhood of Main Street Square where the theatre in question is located, but on the whole the evidence would seem to show that persons coming into Pawtucket from the north and west are in the main directed into the Times Square area. It is, on the other hand, quite clear that there has been, during the decade of the twenties, a very considerable development of the end of East Avenue near Main Street and in the immediate vicinity of this theatre. Several new buildings have been built, nearly all the buildings have been renovated or reconstructed in some way, the street itself has been repaved, and unquestionably very large sums of money have been expended upon developing property in this general neighborhood. The net result of the examination of all the testimony on these issues would seem to show that while on the whole the general trend of new development in Pawtucket has been toward the west and the northwest and toward the Times Square area, nevertheless the portion of the city around Main Street Square has seen a considerable development in the past ten years and has at least held its own.

Testimony relating to rentals and sales of property in the immediate vicinity of the theatre, while of course helpful, is not in any way conclusive. There have not been many sales which could be of great assistance in guiding the Court. Most of the property in this neighborhood is store property and some of it small stores. Obviously a comparison of rentals of property of this type with the theatre property now before the Court does not furnish

a very great degree of similarity, particularly when it is attempted to place a rental on a square foot basis. Further, in this connection it should be noted that since the year 1929 there have been some reductions in rent in this neighborhood, either voluntarily by the parties or when it became necessary to make new leases.

The theatre property under discussion has an area of about 16,517 square feet, the larger part of which is back from East Avenue and about 14,642 square feet of which are covered by the buildings. Similarly, the rentals of other theatres in Pawtucket and Providence, while material and helpful, are in no way conclusive. The Court believes that the rents of moving picture theatres in the downtown district of Providence cannot be very closely compared to the rent of the theatre involved herein. There is a considerable difference, of course, in the land value in the two places. In Providence there is a larger population to draw from, and in many cases it is difficult to tell whether the rent to the lessor is gross or net, and just what burdens the lessee has to carry. Further, in the Providence theatres considerable rent is derived by the lessee from stores and the like. The theatres in Pawtucket, of course, are undoubtedly more of a guide, although no two theatres are similarly situated or otherwise alike. Here, again, the question of gross and net rents comes into the situation. It is undisputed that for the particular property before the Court, the theatre use is the best use. In Pawtucket undoubtedly the best theatre is the LeRoy Theatre in Times Square, which is owner operated. The Strand Theatre is the second theatre of importance. It is well arranged, contains about 1,907 seats, is a first run house, and on the whole is reasonably well situated in the city. It is undoubtedly a much better theatre property than the other small theatres there. It would appear that the rent of

the Imperial Theatre, which is in Times Square, but which is not as large nor as well arranged as the Strand Theatre, was formerly $10,000 per year and was later reduced to $9,000. Also, it is not entirely clear just what additional burdens beside paying the rent the lessee in this case has to assume. Undoubtedly during the decade of the twenties, there was considerable activity and development in real estate in Pawtucket, particularly during the middle of that period. After 1929, and possibly a little before that date, interest in real estate fell off to some extent and rents and values declined somewhat. The complainants argue that, drawing upon previous experience, it is reasonable to expect that during the decade of the thirties there will be a continued growth and expansion in Pawtucket and that values and rents will tend to increase. Of course, since 1929 and particularly at the present time, the real estate market has been and is more or less inactive. Undoubtedly, history and experience tend to show that following a period of depression there is likely to be a period of prosperity. As to the limit and extent of any such movement, this, of course, must be a matter of personal judgment and such judgment is always fallible. Looking at the entire situation, however, the Court is inclined to feel that during the decade of the thirties, taken as a whole, there will be somewhat less growth and somewhat less new activity in real estate in the general neighborhood of the theatre in question than there was during the decade of the twenties. The Court is inclined to believe that the character of this locality is more or less fixed at least for some years. Obviously, the great difficulty in attempting to place a fair and just sum for rental under such a lease as this is the length of the period. During ten years it is possible to have great periods of prosperity and great periods

of depression. However, the parties entered into a lease of this type and both ran the risk of having a situation develop which in any one or two years might seem inequitable. For the sake of a continuous fixed sum over a period of years, they very possibly took the chance, the lessor of being compelled to receive a lower rent in times of good business and high values, and the lessee of having to pay, perhaps, an increased rent in a time of poor business and depression. The question seems to be one of attempting to strike a fair average over the ten-year period, taking into consideration all the circumstances of the property, the location and the economic development.

In order to bring definite figures to the Court's attention, both parties placed on the stand several expert witnesses. Some of these witnesses were real estate operators in the city of Pawtucket and others were from outside of the city. Many of them testify frequently in cases involving real estate and all are men of standing and responsibility. These witnesses took into consideration the lease, the property in question, the general economic situation, the business development in Pawtucket, and rentals and sales of property, in order to assist them in arriving at definite figures. It is quite clear, however, from an examination of their testimony that they approached the subject from an entirely different viewpoint. The result is that the figures presented are so very divergent and so radically different that it is extremely difficult for the Court to know just what consideration and weight to give their testimony. The experts procured by the complainants quite clearly presented figures which were based on what might be termed the gross rental value of the property involved, or what they believed it should be figured on the total annual market value for use and occupation. There is some indication

that they were giving effect to replacement value or sound value. Under our decisions, this clearly would not seem to be the proper test to apply. As a result of this they presented figures which ran from approximately $40,000 a year gross rent to about $29,000 a year gross rent. They applied different tests to check their figures, such as attendance or gross receipts of the theatre, rent per seat, cubical contents of the building, and value per square foot. In passing the Court may say that it was not particularly impressed with the testimony of Mr. Henderson, who gave the highest gross estimate.

After careful consideration of all the evidence, the Court finds itself unable to accept without reservation the estimates presented by these witnesses. On the other hand, the experts presented by the respondent approached the problem obviously from the point of view of a fair return on the investment. Their figures ranged from $9.900 to $10,800. The Court, after consideration, is inclined to think that possibly neither one of these methods in and of itself is entirely correct or sufficient. The problem faced is the fixing of a fair and just sum for the annual rental, taking into consideration all the terms of the lease in question. Undoubtedly, the fair return on the investment is an element to be considered, as is also the fair rental value of this property at this time, in the open market, keeping in mind the provisions of the lease involved herein.

In this connection a consideration of the option to purchase in the lease is of interest. The parties to the lease of their own volition placed the figure of $150,000 as the sale price of the property up to the first day of January, 1930. Clearly, this must have some relation and bearing on the reasonable value of the property at that time. There is evidence in the case that the economic life of a theatre of this type is approximately 25 years. Giving these facts recognition, however,

it would seem to the Court that probably some figure in the neighborhood of $175,000 might be a reasonable average value of this property extended over the present decade. This, perhaps, may not apply to any one particular time during the ten years, as, for example, at present it is common knowledge that the market for real estate is very low, but the above figure may perhaps be taken as representing a fair average over the whole period. If this be so, and taking into consideration the provisions of the lease before the Court and that any rental now fixed is, in effect, a net rental, practically clear to the lessor, and taking into consideration the property, its location, and general conditions in Pawtucket, as disclosed by the evidence. The Court believes that a fair and just sum for the annual rental of the land and the buildings thereon for the ten-year period from January 1, 1930, to December 31, 1939, would be $12,500. This figure may, of course, be checked on the basis of a return on the investment, on the basis of value per square foot, and on the return per seat, keeping in mind, however, the added burdens which the lease requires the lessee to assume and the fact that the rental fixed is in effect net to the lessor.

A decree may be entered in accordance herewith.

For complainants: Messrs. Curran, Hart, Gainer & Carr.

For respondents: Messrs. Edwards & Angell.